**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

MELANIE ROY,

                                CIVIL ACTION NO. 16-11322

        *Plaintiff*,                MAGISTRATE JUDGE PATRICIA T. MORRIS

*v*.

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.

_____/

**MAGISTRATE JUDGE'S OPINION AND ORDER ON CROSS MOTIONS FOR**
**SUMMARY JUDGMENT (Docs. 18, 19)**

**I.**      **OPINION**

      **A.**      **Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Melanie Roy's ("Roy") claim for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.*, and Supplemental Security Income Benefits ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq*. (Doc. 3). On July 26, 2016, the parties consented to the undersigned magistrate judge conducting all proceedings. (Doc. 16.)  The matter is currently before the Court on cross-motions for summary judgment. (Docs. 18, 19).

On September 9 and 27, 2013, Roy filed applications for DIB and SSI, alleging a disability onset date of June 15, 2011 (in her DIB application) and December 15, 2011 (in

1

her SSI application). (Tr. 230-44). The Commissioner denied her claims. (Tr. 136-67). Roy then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on May 21, 2014 before ALJ Jessica Inouye. (Tr. 29-86). At the hearing, Roy—represented by her attorney, Steven Harthorn—testified and amended her alleged onset date to February 2, 2012, (Tr. 34), alongside Vocational Expert ("VE") Glee Ann Kehr. (Tr. 29-86). The ALJ's written decision, issued September 23, 2014, found Roy not disabled. (Tr. 14-28). On February 19, 2016, the Appeals Council denied review, (Tr. 1-4), and Roy filed for judicial review of that final decision on April 12, 2016. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions

2

of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:   If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

3

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42

4

U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.      ALJ Findings

Following the five-step sequential analysis, the ALJ found Roy not disabled under the Act. (Tr. 14-28). At Step One, the ALJ found that Roy met the insured status requirements of the Act through December 31, 2015, and had not engaged in substantial gainful activity since her alleged onset date of February 2, 2012. (Tr. 19). At Step Two, the ALJ concluded that Roy had the following severe impairments: "bilateral carpal tunnel syndrome, major depression, left rotator cuff tear, headaches, degenerative disc disease, pelvic organ prolapse and obesity . . . ." (*Id.*). The ALJ also decided, however, that none of these impairments, either singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 19-21). The ALJ then found that Roy had the residual functional capacity ("RFC") to perform light work with the following additional limitations:

> [F]requent performance of postural activities but no climbing of ladders, ropes or scaffolds; occasional reaching overhead with her left (non-dominant) arm; avoidance of concentrated exposure to temperature extremes, pulmonary irritants and hazards and even moderate exposure to vibrations; and limitation to unskilled simple, routine, repetitive tasks.

(Tr. 21). At Step Four, the ALJ found Roy unable of performing any past relevant work. (Tr. 23). Thereafter, the ALJ found that there nevertheless remained "jobs that exist in significant numbers in the national economy" that Roy could perform. (Tr. 23).

### E.      Administrative Record

#### 1.      Medical Evidence

The Court has reviewed Roy's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

### 2. Application Reports and Administrative Hearing

### i. Function Reports

Roy filled out a Function Report on October 11, 2013. (Tr. 297-304). Describing her condition, she noted "lots of c[h]ronic pain" in her stomach, colon, and vagina. (Tr. 297). In a typical day, she bathed, dressed, fixed breakfast, and watched television. (Tr. 298). She indicated that she lived with and took care of her son without help. (*Id.*). Before her illness, she could "walk fast" and "dance," which she could no longer do. (*Id.*). Her pain would keep her up at night. (*Id.*). She denoted an inability to dress, bathe, care for her hair, feed herself, and use the toilet. (*Id.*).

Thereafter, Roy indicated that she prepared her own meals—canned goods and fried foods "daily if . . . hungry." (Tr. 199). This took "maybe 5-15 min[utes]," and she would "sit sometimes" while cooking. (*Id.*). Aside from making her bed "sometimes," she denied doing chores. (*Id.*). With house and yard work, Roy's son "help[ed] because of [her] pain." (Tr. 300). When she left the house, it was to attend doctor's appointments or shop for food, but she could not drive because doing so scared her and she held no driver's license. (*Id.*). She retained, however, an ability to pay bills, count change, handle a savings account, and use a checkbook or money orders. (*Id.*). She listed no hobbies as "things are to[o] painful . . . ." (Tr. 301). The only social events she attended were "family gatherings" on Christmas and Thanksgiving. (*Id.*).

6

With respect to her physical abilities, Roy reported difficulty with lifting, squatting, bending, standing, walking, kneeling, and stair climbing. (Tr. 302). She averred a capacity to walk only three feet before needing to rest twenty minutes. (*Id.*). A doctor prescribed her a cane to assist with ambulation, which she found difficult. (Tr. 303).

Roy's son, Andrew, also filled out a Third-Party Function Report. (Tr. 271-78). It largely duplicates the information provided in Roy's Function Report, though elaborates on the origin of Roy's pain as a surgical error. (Tr. 271, 276).

### ii.        Roy's Testimony at the Administrative Hearing

Roy opened her testimony by amending her alleged onset date to February 2, 2012. (Tr. 34). She said that she lived with her two sons in a house in Highland Park. (*Id.*). As of 2012, Roy indicated that she developed an inability to control her bladder, which "had dropped out, and I ended up having surgery to put it back in, but . . . they couldn't do that . . . so I ended up getting a transvaginal mesh." (Tr. 35). "I get . . . shots every two weeks for the pain in my vagina. It's unbearable, and it makes it hard for me to do anything." (*Id.*). Though the shots helped with the pain, they made standing difficult because they "numb[ed]" her. (Tr. 36). She also suffered from "a lot of back pain" and "leg pain in my feet and . . . [right] leg" which made it "hard for me to walk." (*Id.*). "I walk with a cane, but I don't have it today because the dog chewed it up." (*Id.*). That February, a test determined she suffered from nerve damage. (*Id.*). Roy noted, as well, that she suffered from a torn rotator cuff on her left shoulder. (Tr. 37).

When asked about mental impairment, Roy noted that she struggled with "[u]ncontrollable thoughts" that made "it very hard for me to concentrate." (Tr. 38). "[I]t's like, I might forget how to tie my shoes. . . . I just get frustrated and emotional real quick." (Tr. 52). Both her cousin and sister "are schizophrenic, and both have tried to commit suicide." (Tr. 38). She later noted "hear[ing] voices" despite some success with medication. (Tr. 45). "It's like everybody talking at one time, like I'm in a big crowd, and everybody's talking at one time, and everybody's talking real fast, and I'm trying to understand what they're saying." (Tr. 55-56). This began when Roy was "a teenager." (Tr. 56). To escape, she would "go in the bathroom. . . . turn off the light, and just put my hands over my ears and over my head, and just close my eyes." (Tr. 58). Several times a month, Roy also would "see shadows." (Tr. 59).

Until 2012, Roy was involved in an abusive marriage, and after her divorce she was able to acquire insurance in February of that year and start treating with her psychiatrist, Dr. Dillard, and her gynecologist, Dr. Abed. (Tr. 39). Indeed, Dr. Abed's treating relationship with Roy extended back to 2009, and he acted as her treating physician for most of Roy's health problems: "I let him know how I'm feeling physically, the pain, and that the pain is very unbearable, and it's just hard for me to do a lot of things to where I just stay in the bed because I'm in a lot of pain. I can't sit a lot. It's just hard." (Tr. 39-40). Her treatment with Dr. Dillard was "more sporadic," and though he "does want me to go into the hospital to have more intense treatment with my mental problem, as far as me being bipolar and schizophrenic," Roy never sought such treatment. (Tr. 40-41).

Roy lived with both of her sons; one worked and the other one was developmentally disabled. (Tr. 41). Her working son did "everything. He takes care of me and my other son. I don't cook. He cooks and cleans. He buys the groceries, and he pays all the bills. . . . He does everything for me." (*Id.*). She indicated that she slept all day because her pain medication "relaxes me to where it makes me sleep." (Tr. 43). She also described her pain as so bad that "I don't really get out of bed at all. . . . It's hard to get up." (Tr. 44).

Roy confirmed that she did not drive because she "had a bad accident" when she was sixteen years old. (*Id.*). Aside from going to the doctor, Roy did not "do anything. I stay home. . . . I can't do anything. It hurts too bad," although she admitted that "I turn the TV on so I can hear the noise. I don't really watch TV." (Tr. 45). Detailing symptoms in her back and leg, Roy said "[t]he pain shoots up and down from my thigh, all the way down to my feet and my toes. So a lot of times, I have to wear loose shoes because of the pain and the swelling. It's almost like I'm being stuck with a sharp object." (Tr. 47). But she made clear that her back and leg were not the only sources of her pain. She noted, for instance, "real bad migraine headaches" exacerbated by light, for which she received "injections in the back of my head," (*id.*), as well as "problems with lumps throughout" her body, such as in her hand and throat. (Tr. 49-50). Regarding her hearing loss, she noted that "[s]ometimes it's hard to distinguish the traffic when I'm trying to cross the street" because "[i]t's hard to hear it." (Tr. 73). Her eardrum "had been ruptured" from her husband's physical abuse. (Tr. 74). She also relayed her need to "wear Depend"

because she lacked "control over my bladder." (Tr. 62). Due to this issue, in particular, Roy never attended cosmetology school after enrolling. (Tr. 64).

The ALJ began questioning Roy about prostitution on the record. She noticed its mention in the medical records and asked her "when is the last time you had sex for money?" (Tr. 66). Roy indicated she had not engaged in that conduct since she "was a teenager," and reiterated that "with all these problems that I have, I don't have sex at all. It hurts down there." (*Id.*). The ALJ then drew attention to "a number of records . . . [with] a lot of notes on them, like stars, or like, 'This is my,' blah, blah, blah," and asked if Roy had marked these records. (Tr. 68). Roy's attorney, Mr. Harthorn, suggested that his "assistant" made the marks. (*Id.*). Roy first denied altering any forms, but then admitted she had written on one of the exhibits. (Tr. 69, 72).

### iii.       The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine Roy's ability to perform work. (Tr. 76). Commencing her first hypothetical, the ALJ asked the VE to assume "an individual of [Roy's] age, education, and past work experience" who could "perform work at the light exertional range, but should avoid concentrated exposure to unprotected heights, vibrating tools, and moving machinery. Can the hypothetical individual perform [Roy's] past work?" (Tr. 77). The VE indicated that such an individual could perform Roy's past work, both as performed and per the DOT. (Tr. 77-78).

The ALJ moved to a second hypothetical about an individual "limited to work in the light exertional range; can engage in frequent postural activities, but no climbing of

ladders, ropes, and scaffolding; avoid concentrated exposure to . . . temperatures and pulmonary irritants, and hazards; avoid even moderate exposure to vibrations; left overhead reach on an occasional basis; that's the non-dominant arm. This individual can perform work that is unskilled, simple, routine, and repetitive tasks. Can this hypothetical individual perform the claimant's past work?" (Tr. 78). The VE replied "No" because "this is an unskilled RFC, and there's no unskilled past work." (*Id.*). Thereafter, however, the VE highlighted "other appropriate types of positions," including: "mailroom clerk"— with 3,200 local and 131,700 national job availabilities—"merchandise markers"—with 15,900 local and 864,400 national job availabilities—and "housekeeping jobs"—with 12,100 local and 887,800 national job availabilities—all of which are "light, unskilled, and SVP 2 positions." (Tr. 79).

In her third hypothetical, the ALJ added the limitations "that this individual would need to change to the sitting position after one hour of standing for a total of four hours. Eight hours in the workday could be spent standing," or put another way, "one hour standing, one hour sitting, alternating[.]" (Tr. 79-80). "Sitting is still going to remain the six out of eight hours. I'm going to reduce the pushing and pulling with the right lower extremity to an occasional basis. I'm going to reduce the postural activities all down to occasional, still remaining, though with the no climbing of ladders, ropes, and scaffolding; avoid all hazards, this time, of heights and moving, dangerous machinery. I'm also going to add on no tandem tasks or teamwork, and occasional brief interactions with the general public, as required by the work tasks and no greater than that; and only occasional changes in the work tasks, and occasional decision making as part of the work.

11

Does that allow for the performance of any competitive work?" (Tr. 80-81). The VE specified that "there wouldn't be light jobs available under this hypothetical. There would only be sedentary." (Tr. 81).

In the fourth hypothetical, the hypothetical individual "can sit for two hours, can stand for one hour. The total sitting though is only two hours. The total standing and walking is less than two hours total. Just thinking about those limitations alone, does that allow for competitive work?" (*Id.*). The VE noted that "if you add up the number of hours that's less than full-time competitive work," and thus no jobs would be available. (*Id.*).

In the fifth hypothetical, the individual "needs to take unscheduled breaks approximately every one to two hours in a typical work day; this would be in addition to typical breaks and lunches, at least 15 minutes per break. Is that consistent with competitive work?" (Tr. 82). The VE replied "[n]o, no more than one day per month would be allowable," and that "[n]o more than 15 percent of the work time would be allowable for off task time." (*Id.*).

## F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an

impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).   Both   "acceptable"
and non-acceptable sources provide evidence to the Commissioner, often in the form of
opinions "about the nature and severity of an individual's impairment(s), including
symptoms, diagnosis and prognosis, what the individual can still do despite the
impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical
sources" issue such opinions, the regulations deem the statements to be "medical
opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527.
Excluded from the definition of "medical opinions" are various decisions reserved to the
Commissioner, such as whether the claimant meets the statutory definition of disability
and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of
medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at
whether the source examined the claimant, "the length of the treatment relationship and
the frequency of examination, the nature and extent of the treatment relationship,
supportability of the opinion, consistency of the opinion with the record as a whole, and
specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544
(6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to
"other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th
Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if
they are "well-supported by medically acceptable clinical and laboratory diagnostic
techniques" and are "not inconsistent with the other substantial evidence in [the] case

13

record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

14

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish

15

the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless,

the ALJ may not disregard the claimant's subjective complaints about the severity and

persistence of the pain simply because they lack substantiating objective evidence. SSR

96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective

confirming evidence forces the ALJ to consider the following factors:

> (i)    [D]aily activities;
> (ii)   The location, duration, frequency, and intensity of . . . pain;
> (iii)  Precipitating and aggravating factors;
> (iv)   The type, dosage, effectiveness, and side effects of any medication .
>        . . taken to alleviate . . . pain or other symptoms;
> (v)    Treatment, other than medication, . . . received for relief of . . . pain;
> (vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027,

1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).

Furthermore, the claimant's work history and the consistency of his or her subjective

statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at

*5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the

groundwork for this, stating, "An individual shall not be considered to be under a

disability unless he [or she] furnishes such medical and other evidence of the existence

thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482

U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her]

limitations," and is measured using "all the relevant evidence in [the] case record." 20

C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all

credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human*

16

*Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

In this case, there was a prior decision denying benefits dated December 14, 2011. In the Sixth Circuit, a prior decision by the Commissioner can preclude relitigation in subsequent cases.

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

SSAR 98-4(6), 1998 WL 283902, at *3 (acquiescing to *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997)). The regulations also explicitly invoke *res judicata*: An ALJ can dismiss a hearing where "res judicata applied in that we have a previous [final] determination or decision under this subpart about your rights." 20 C.F.R. §§ 404.957, 416.1457. Collateral estoppel is the branch of *res judicata* applied in this context. As the Third Circuit explained, *res judicata* formally "consists of two preclusion concepts: issue preclusion and claim preclusion." *Purter v. Heckler*, 771 F.2d 682, 689 n.5 (3d Cir. 1985); *see also Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) (discussing the "collateral estoppel branch of res judicata" in social security cases). Claim preclusion prevents reviewing a judgment on the same cause of action; issue preclusion, or collateral estoppel is less expansive: "foreclosing relitigation on all matters that were actually and necessarily determined in a prior suit." *Purter*, 771 F.2d at 689 n.5.

17

The *res judicata* effect of past ALJ decisions is actually a form of collateral estoppel precluding reconsideration of discrete factual findings and issues. *See Brewster v. Barnhart*, 145 F. App'x 542, 546 (6th Cir. 2005) ("This Court will apply collateral estoppel to preclude reconsideration by a subsequent ALJ of factual findings that have already been decided by a prior ALJ when there are no changed circumstances requiring review."). The Commissioner's internal guide explains the different issues and factual findings precluded by *res judicata* under *Drummond. See Soc. Sec. Admin., Hearings, Appeals, and Litigation Law Manual*, § I-5-4-62, 1999 WL 33615029, at *8-9 (Dec. 30, 1999). These include the RFC and various other findings along the sequential evaluation process, such as "whether a claimant's work activity constitutes substantial gainful activity," whether she has a severe impairment or combination of impairments, or whether she meets or equals a listing. *Id.*

Evidence of "changed circumstances" after the prior decision allows the ALJ to make new findings concerning the unadjudicated period without disturbing the earlier decision. *See Bailey ex rel. Bailey v. Astrue*, No, 10-262, 2011 WL 4478943, at *3 (E.D. Ky. Sept. 26, 2011) (citing *Drummond*, 126 F.3d at 842-43). In other words, even though the first ALJ did not make any findings concerning later periods, her decision still applies to those periods absent the requisite proof of changed circumstances. Thus, as applied in this Circuit, the SSAR 98-4(6) and *Drummond* essentially create a presumption that the facts found in a prior ruling remain true in a subsequent unadjudicated period unless "there is new and material evidence" on the finding. *See Makinson v. Colvin*, No. 5: 12CV2643, 2013 WL 4012773, at *5 (N.D. Ohio Aug. 6, 2013) (adopting Report &

Recommendation) ("[U]nder *Drummond* and AR 98-4(6), a change in the period of disability alleged does not preclude the application of *res judicata*." (citing *Slick v. Comm'r of Soc. Sec.*, No. 07-13521, 2009 U.S. Dist. LEXIS 3653, 2009 WL 136890, at *4 (E.D. Mich. Jan. 16, 2009))); *cf. Randolph v. Astrue*, 291 F. App'x 979, 981 (11th Cir. 2008) (characterizing the Sixth Circuit's rule as creating a presumption); *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988) ("The claimant, in order to overcome the presumption of continuing nondisability arising from the first administrative law judge's findings of nondisability, must prove 'changed circumstances' indicating a greater disability." (quoting *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985))).

In *Drummond*, for example, the court held that the first ALJ's RFC applied to a subsequent period unless the circumstances had changed. 126 F.3d at 843; *see also Priest v. Soc. Sec. Admin.*, 3 F. App'x 275, 276 (6th Cir. 2001) (noting that in order to win benefits for a period after a previous denial, the claimant "must demonstrate that her condition has so worsened in comparison to her condition [as of the previous denial] that she was unable to perform substantial gainful activity"); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-33 (6th Cir. 1993) (same). The Sixth Circuit made this clear in *Haun v. Commissioner of Social Security*, rejecting the argument that *Drummond* allowed a second ALJ to examine *de novo* the unadjudicated period following the first denial. 107 F. App'x 462, 464 (6th Cir. 2004).

To overcome the presumption that the claimant remains able to work in a subsequent period, the claimant must proffer new and material evidence that her health declined. The Sixth Circuit has consistently anchored the analysis on the comparison

19

between "circumstances existing at the time of the prior decision and circumstances existing at the time of the review . . . ." *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007). In a case predating *Drummond*, the court explained. "[W]hen a plaintiff previously has been adjudicated not disabled, she must show that her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity." *Casey*, 987 F.2d at 1232-33. Later, it reiterated, "In order to be awarded benefits for her condition since [the previous denial], Priest must demonstrate that her condition has . . . worsened in comparison to her [previous] condition . . . ." *Priest*, 3 F. App'x at 276. The ALJ must scan the medical evidence "with an eye toward finding some change from the previous ALJ decision . . . ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:1-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012), *Report & Recommendation adopted by* 2013 WL 53980, at *1 (Jan. 2, 2013). That is, the evidence must not only be new and material, but also must show deterioration. *Drogowski v. Comm'r of Soc. Sec.*, No. 10-12080, 2011 U.S. Dist. LEXIS 115925, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011), *Report & Recommendation adopted by* 2011 U.S. Dist. LEXIS 110609, 2011 WL 4502955, at *4 (Sept. 28, 2011). In *Drogowski*, for example, the court rejected the plaintiff's argument that a report met this test simply because it was not before the first ALJ. *See* 2011 WL 4502988 at *2, 8-9. These decisions make clear that the relevant change in circumstances is not a change in the availability of evidence but a change in Plaintiff's condition.

*Res judicata* is not a complete bar on reconsidering prior decisions or determinations: the regulations provide two mechanisms for such reexamination that

escape the doctrine's effects. *Purter*, 771 F.2d at 691-93 (discussing reopening as an exception to claim preclusion). The first, less important to *res judicata* case law, occurs just after the initial determination, when the claimant's first step in the review process is sometimes a request for "reconsideration" of that decision. 20 C.F.R. §§ 404.907, 416.1407.

The more critical and complicated mechanism is reopening a prior ALJ decision. The regulations allow the Commissioner, through an ALJ or Appeals Council, to peel back the determination or decision and revise it. 20 C.F. R. §§ 404.987, 404.992, 416.1487, 416.1492. The claimant or the Commissioner can initiate the process. *Id.* The reopening of a determination or decision can occur "for any reason" within twelve months of the notice of the initial determination, but "good cause" must exist if the reopening occurs within two years of the initial determination for SSI claims and four years for DIB claims. *Id.* §§ 404.988, 416.1488. A DIB claim can also be reopened at any time under a few scenarios not relevant to the instant case. *Id.* § 404.988(c). Good cause exists, among other reasons, if "[n]ew and material evidence is furnished" for either type of claim, SSI or DIB. *Id.* §§ 404.989, 416.1489. If a determination or decision is reopened, *res judicata* does not apply. *Kaszer v. Massanari*, 40 F. App'x 686, 690 (3d Cir. 2002).

The decision whether to reopen, unless it implicates a colorable constitutional issue, evades judicial review: courts can only review the Commissioner's final decisions made after a hearing. *See* 42 U.S.C. § 405(g); *Califano v. Sanders*, 430 U.S. 99, 108-09 (1977) (holding that Commissioner's decision not to reopen is unreviewable). However,

21

courts may review a decision not to reopen a case "to determine whether *res judicata* has been properly applied to bar the pending claim or whether, even though *res judicata* might properly have been applied, the prior claim has nevertheless been reopened." *Tobak v. Apfel*, 195 F.3d 183, 187 (3d Cir. 1999); *see also Kaszer,* 40 F. App'x at 690 ("But 'we will examine the record to determine whether or not a reopening has occurred.'" (quoting *Coup v. Heckler*, 834 F.2d 313, 317 (3d Cir. 1987))).

Implicit reopenings occur, with unfortunate frequency, where the ALJ crafts a decision that appears to "readjudicat[e] part of the period already adjudicated by the first decision" rather than "adjudicate only the subsequent period." *Gay v. Comm'r of Soc. Sec.*, 520 F. App'x 354, 358 (6th Cir. 2013). As the Sixth Circuit lamented,

> If an ALJ intends to reopen prior decisions, he or she should say so, say why, and cite the appropriate regulation that permits reopening. If an ALJ intends instead to adjudicate only the subsequent period in light of changed circumstances, he or she should make this approach clear and cite the appropriate cases and acquiescence rulings. Regardless of which path the ALJs take, they must clearly state their approach.

*Id.*; *see also Haddix v. Astrue*, No. 10-30, 2010 WL 4683766, at *1-4 (E.D. Ky. Nov. 12, 2010) (remanding where ALJ's decision was unclear).

Constructive reopenings are found where the ALJ reviewed the entire record including the portions from the already adjudicated period, and decided "the merits of the claim." *Tobak*, 195 F.3d at 186. Thus, the Sixth Circuit found a reopening where the ALJ considered the entire period "in light of the new evidence . . . ." *Wilson v. Califano*, 580 F.2d 208, 212 (6th Cir. 1978). An additional factor that could lead to finding an implicit reopening is the ALJ's failure to discuss the prior determination or the *res judicata*

doctrine. *See Martin v. Comm'r of Soc. Sec.*, 82 F. App'x 453, 455 (6th Cir. 2003); *Crady v. Sec'y of Health & Human Servs.*, 835 F.2d 617, 620 (6th Cir. 1987). Nonetheless, an ALJ's review of old or new evidence does not necessarily signify a constructive reopening, for such a review would be required to decide against reopening as well as for it. *See Girard v. Chater*, 918 F. Supp. 42, 44-45 (D.R.I. 1996). The ALJ's discussion of new evidence likewise might relate to her independent determination of whether to grant benefits in the unadjudicated period, again indicating no reopening occurred. *See id.* at 44.

The ability to reopen—explicitly or implicitly—must meet certain regulatory requirements. 20 C.F.R. §§ 404.987-404.996, 416.1487-416.1494. Chief among these is the two year (SSI) and four year (DIB) time limits for good cause reopenings. *Id.* §§ 404.988, 416.1488. Consequently, an ALJ is powerless to reopen a claim outside these periods. *See Glazer v. Comm'r of Soc. Sec.*, 92 F. App'x 312, 315 (6th Cir. 2004) ("Because more than four years had passed since the denial of the original application, the Commissioner could not have constructively reopened Glazer's case.").

## G.    Analysis

Although the *res judicata* standards stated above apply in the instant case, neither of the parties applied such standards in their briefs. Since application of the *res judicata* standards would only make proof of disability more difficult for the Plaintiff, and since I find that the ALJ's decision is supported by substantial evidence even under the lesser standard that does not include res judicata, I will address the issues as presented by the parties. Roy includes in her Motion three general arguments: (1) that the ALJ improperly

23

weighed the medical sources in the record, and failed to discuss Roy's treating psychiatric providers; (2) that the ALJ's credibility determination was flawed, as he should have given more weight to Roy's complaints of pain; and (3) that as a result of these defects, the RFC contains flawed findings as to Roy's exertional and non-exertional limitations. I address each in turn.

### 1. Medical Sources

Roy takes issue with the manner in which the ALJ weighed almost every medical source, and in particular postulates that the ALJ erred in granting Dr. Abed, her treating physician, no weight "despite the fact that he provided treatment notes and performed multiple injection procedures." (Doc. 18 at ID 1396). In rejecting Dr. Abed's opinion, the ALJ reasoned that Roy had "admitted to marking up some exhibits with stars on the sides" and that the "two different sets of marks and handwriting" generated a concern "the form may have been tampered with, as it did not come directly from Dr. Abed and he did not submit a clean copy when requested." (Tr. 22).

Evaluating medical source statements requires considering factors such as the nature of the source's examining relationship with the client, 20 C.F.R. § 404.1527(c)(1), the source's treatment relationship with the client, *id.* § (c)(2), the supportability of the source's opinion, *id.* § (c)(3), the consistency of the opinion with the record as a whole, *id.* § (c)(4), whether the source is a specialist opining on areas within her specialty, *id.* § (c)(5), as well as "any factors" the claimant or others "bring to [the Commissioner's] attention, or of which [the Commissioner] is aware, which tend to support or contradict the opinion," *id* § (c)(6). In weighing a treating source statement, the ALJ considers the

24

length of the treatment relationship and frequency of examination, as well as the nature and extent of the treatment relationship. *Id.* § (c)(2)(i)-(ii). Where a treating source's opinion proves "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it "controlling weight." *Id.* § (c)(2). In any case, the Commissioner "will always give good reasons. . . for the weight we give [a] treating source's opinion." *Id.*

The ALJ provided good reasons for discrediting Dr. Abed's opinion. As the ALJ noted, Roy admitted that she wrote on some of the medical evidence, (Tr. 72-73), and the opinion itself contained inconsistent assertions and two sets of handwriting. (Tr. 1268) (one set of handwriting read "pain is fatiguing client" while another crossed out "fatiguing client" and wrote "debilitating her ability to sit or stand for long time"); (Tr. 1269) (marking both "Incapable of even 'low stress' jobs" and "Capable of low stress jobs"); (*id.*) (marking "Depression" and "Anxiety" as "psychological conditions affecting your patient's physical condition," but with the word "None" jotted below). These facts impugned the reliability of Dr. Abed's notes, and the ALJ was permitted to draw such an inference. *See Young v. Sec'y of Health & Human Servs.*, 787 F.2d 1064, 1066 (6th Cir. 1986) ("A reviewing court does not conduct a *de novo* examination of the evidence and it is not free to substitute its findings of fact for those of the Secretary if substantial evidence supports those findings and inferences."); *cf. Malak v. Astrue*, 246 F. App'x 482, 484-85 (9th Cir. 2007) ("Because California law requires health care providers to retain medical records for only seven years, many of the records which might have

25

supported Malak's case were destroyed. However, Malak claimed to have obtained records from this period from his doctors. Some documents were undated and relied on Malak's testimony to establish the date and the authenticity of the records. . . . [T]he ALJ's conclusion that these documents were not authentic, especially in light of Malak's poor credibility, was supported by substantial evidence." (citation omitted)).

Roy also laments that the ALJ "discounted the opinion of Dr. Imasa," making the argument that Dr. Imasa's opinion remained in conformity with the great weight of the evidence, (Doc. 18 at ID 1397), and "failed to even discuss . . . treating physician Dr. Charletta Dilliard [sic] . . . who diagnosed [] Roy as suffering from Depression with psychosis and a GAF of 45 . . . ." (Doc. 18 at ID 1392). With respect to Dr. Imasa's findings, Defendant contends they do not "constitute or contain a 'medical opinion,' as the report does not describe 'what [Roy] can still do despite [her] impairment(s).'" (Doc. 19 at ID 1425-26) (quoting 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)). As for Dr. Dillard's opinion, Defendant posits that Dr. Dillard was not a treating psychiatrist, but that even if she were, "the ALJ is not required to explicitly mention any particular piece of evidence or testimony." (Doc. 19 at ID 1424 & n.9).

The report from Dr. Imasa notes a number of Roy's complaints, and thereafter diagnoses major depressive disorder and provides a "[g]uarded" prognosis, indicating as well that she "needs therapeutic intervention and support services." (Tr. 1208-09). Axiomatically, social security law does not recognize a diagnosis, in itself, as a commentary on the severity of a claimant's condition. *E.g. Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("[T]he mere diagnosis of [an impairment], of course, says

26

nothing about the severity of the condition."). Likewise, Dr. Imasa's vague prognosis—which includes recommended treatments but nothing speaking to what Roy "can still do despite" her impairments or her "physical or mental restrictions," 20 C.F.R. 404.1527(a)(2)—does not offer a medical opinion deserving weight. *Accord Dunlap v. Comm'r of Soc. Sec.*, 509 F. App'x 472, 476 (6th Cir. 2012).

Roy's argument as to Dr. Dillard fares little better. As an initial matter, Defendant incorrectly supposes that Dr. Dillard's potential status as a treating source "is not reasonably dispositive of the case," (Doc. 19 at ID 1424 n.9)—indeed, *if* Dr. Dillard were a treating source, and *if* it became evident that the ALJ neither directly nor indirectly provided good reasons for discounting the opinion, then remand would be required. *See generally Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-71 (6th Cir. 2006) (acknowledging that ALJs must provide good reasons, but outlining how an ALJ's opinion may also indirectly meet "the goal of § 1527(d)(2) . . . even though she has not complied with the terms of the regulation" (quoting *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 462 (6th Cir. 2005))). Yet Defendant need not fret, for Roy has not fulfilled her burden to demonstrate that Dr. Dillard qualified as a treating source—the record contains only three appointments over two years, and fails to convincingly show an "ongoing treatment relationship," 20 C.F.R. § 404.1502—and the ALJ's opinion suggests she considered the reliability of Dr. Dillard's opinion. (Tr. 22) (citing one of Dr. Dillard's examination notes as support for her finding that Roy was exaggerating her depressive symptoms); *see, e.g.*, *Downs v. Comm'r of Soc. Sec.*, 634 F. App'x 551, 552 n.2 (6th Cir. 2016) (noting that a "handful of visits" does not "necessarily render" a physician a

27

"'treating source' with an 'ongoing treatment relationship'" with a claimant (quoting 20 C.F.R. 404.1502)); *Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1000 n.3 ("[I]t is questionable whether a physician who examines a patient only three times over a four-month period is a treating source—as opposed to a nontreating (but examining) source."); *Boucher v. Apfel*, 238 F.3d 419, at \*9 (6th Cir. Nov. 15, 2000) (finding a doctor who had examined the claimant three times over a two-year period was not a treating source because he did not have an ongoing treatment relationship with the claimant). Even assuming Dr. Dillard was a treating source, the ALJ indirectly provided sufficient reason to discount her findings—stars appear in the margins of Dr. Dillard's notes in the record, (Tr. 1274-76, 1284-87), which (as the ALJ noted) makes their authenticity suspect. (Tr. 22) (citing Exhibit B7F, which held Dr. Dillard's notes, as affected by Roy's admission that she "mark[ed] up some exhibits").[1]

Lastly, Roy challenges the ALJ's decision to afford opinions from Dr. Flores and Dr. King great weight because they allegedly did not consider Roy's medications or "Behavioral Health Records" from Henry Ford Health, treatment notes indicating moderately severe chronic radiculopathy with muscle denervation, or the fact that Roy received nerve blocks due to "chronic pelvic and vagina pain." (Doc. 18 at ID 1398-

---

[1] Included alongside Roy's argument as to Dr. Dillard is her position that the GAF of 45 that Dr. Dillard assessed should have impacted the ALJ's analysis. But GAF scores are not entitled to any particular treatment or weight. *See, e.g.*, *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 508 (6th Cir. 2013) ("[N]o particular amount of weight is required to be placed on a GAF score."); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy."). Where, as here, the ALJ legitimately discounted records from a particular medical source, the suggestion that a GAF score assessed by that medical source deserved more weight proves especially baseless. *See Sanders v. Comm'r of Soc. Sec.*, 66 F. App'x 551, 553-54 (6th Cir. 2003) (upholding the ALJ's decision to afford less weight to GAF scores from medical sources whose opinions had been discredited).

1400). But as Defendant correctly notes, "a reviewing source is not required to explicitly mention a notation in the evidence to demonstrate that she considered it." (Doc. 19 at ID 1414) (citing *Loral Defense Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)). Indeed, These doctors plainly considered all the evidence that Roy suggests they did not, *see* (Tr. 154-55, 158-59). *Compare* (Doc. 18 at 1400) ("The record does not mention treatment notes from 8/9/2013 which indicate new EMG reports . . . .", *with* (Tr. 140) (listing this August 9, 2013 record among the evidence before Dr. Flores and Dr. King). Dr. King also found that, though Roy suffered from depression, no medical evidence backed up her claims as to the severity of her symptoms. (Tr. 157, 162). The ALJ discussed the medical evidence, and provided these opinions great weight because "although not [from] examining or treating physicians," their "proposed RFCs [were] consistent with the weight of the medical evidence." (Tr. 23). Substantial evidence buttresses this weight assignment.

## 2.  Credibility Determination

In challenging the ALJ's credibility determination, Roy highlights several particular statements. She notes first that the ALJ found Roy's complaints "often without demonstrated etiology," ignoring her "repeated[] . . . reference[s] [to] a failed vaginal prolapse and several repeat surgical procedures and required the injections due to pain." (Doc. 18 at ID 1400) (internal quotation marks omitted). Roy also decries the ALJ's willingness to question her credibility "due to stars on submitted medical records" when there was "no indication that the medical form supplied by the treating physician were in

any way tampered with or compromised and an affidavit is attached that the form was submitted as received." (Doc. 18 at ID 1401).

Under SSR 96-7p, a dearth of objective evidence underlying a claimant's statements about her pain may not, *on its own*, undermine the credibility of those statements. *See* 1996 WL 374186, at *1 (S.S.A. July 2, 1996). The ALJ did not, however, merely cite Roy's lack of "demonstrated etiology" for her symptoms in her opinion. (Tr. 22). She noted, as well, that Roy "denied being in school, despite specific notes" showing that she requested accommodations from doctors for class, (*id.*); (Tr. 64, 1221), and cited medical notes showing her symptoms were "helped by the injections and Neurontin." (Tr. 22-23); *e.g.* (Tr. 640, 686, 1222, 1242, 1265). In addition, and for reasons discussed above, the ALJ was justified in withholding trust from any records Roy (or someone else) may have altered in any way.

Roy also argues that the ALJ "incorporated unsubstantiated medical evidence of a past history of prostitution" during the hearing that "impugned" her credibility. (Doc. 18 at ID 1392). Indeed, Roy goes so far as to label the ALJ's line of questioning as "derogatory . . . ." (Doc. 20 at ID 1432). When faced with such an objection, courts must entertain the "presumption that policymakers with decisionmaking power exercise their power with honesty and integrity," a presumption only overcome with "convincing evidence that 'a risk of actual bias or prejudgment' is present." *Navistar Int'l. Transportation Corp. v. United States Environmental Protection Agency*, 941 F.2d 1339, 1360 (6th Cir. 1991) (citing *Schweiker v. McClure*, 456 U.S. 188, 196 (1982). The questioning at issue does not demonstrate such a risk. It occurred during Roy's hearing,

and made no appearance in the ALJ's ultimate opinion—on this fact alone, there seems no defensible indication that the ALJ drew any impermissible inferences from it. (Tr. 66).

Even so, the ALJ would have been permitted to draw a negative inference had she so desired. Although such inquiries may have made Roy uncomfortable, the record evidence, embodied in the prior ALJ's decision, suggests she engaged in prostitution as late as 2010, long after her teenage years had passed. *Compare* (Tr. 66) ("I haven't [had sex for money since] . . . I was a teenager"; "[W]ith all these problems that I have, I don't have sex at all. It hurts down there."), *with* (Tr. 124) ("The claimant reported to the examiners that to support her income, she had been, 'prostituting herself for many years and involved in extra marital affairs throughout her 28 years of marriage' because, "I was bored and I liked it.'"). An ALJ is entitled to investigate the record, particularly when the past work (here, sex work) is linked to allegedly disabling conditions (here, vaginal prolapse). *See* 20 C.F.R. §§ 404.1571, 416.971 ("The work, *without regard to legality*, that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level." (emphasis added)). Moreover, the ALJ's questioning at the hearing covered far more ground than this. Put simply, Roy's bias argument is unconvincing because "[a]n objective observer, listening to the hearing as a whole, would not have been convinced from the conduct of the hearing that the ALJ's fairness need be questioned." *Collier v. Comm'r of Soc. Sec.*, 108 F. App'x 358, 364 (6th Cir. 2004) (rejecting a claimant's bias claim regarding questions about her "marijuana and cigarette use," "daughter's pregnancy," "her children's father," and her "relationship with him").

31

Roy's most durable contention notes that the ALJ's credibility determination relied in part on alleged hearing testimony that she had not heard voices in the months before the hearing. *E.g.* (Doc. 20 at ID 1432); (Tr. 22) ("[S]he admitted at the hearing that she had not heard voices in the prior three months."). In fact, Roy never said this, or at least the hearing transcript contains no such statement—its inclusion in the ALJ's credibility determination was error. Nevertheless, such error proves harmless, for the ALJ's credibility determination remains supported by other substantial evidence. *Accord Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 507 (6th Cir. 2013) ("[I]f an ALJ's adverse credibility determination is based partially on invalid reasons, harmless error analysis applies to the determination, and the ALJ's decision will be upheld as long as substantial evidence remains to support it." (citing *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012))). Although Roy's concern with the ALJ's citation to nonexistent hearing testimony is well taken, the ALJ's credibility should not be disturbed.

### 3.  RFC Findings

Roy suggests that due to the ALJ's improper credibility determination and inelegant assignment of weight to the medical sources of record, the ALJ's ultimate RFC findings are flawed. As discussed at some length above, the ALJ committed no such analytical errors, and thus *a fortiori* they could not have tainted the RFC analysis. But Roy pigeonholes into her broader argument a number of other more pointed, less developed contentions not touched on in the above discussion: (i) the ALJ "did not discuss the effects of the multiple pain and psychiatric medications that were administered in this case"; (ii) the ALJ "failed to evaluate whether the claimant is capable

32

of a competitive work schedule" as required by SSR 96-8p; (iii) "the Function Reports submitted by [Roy] and her son [Andrew] were not discussed, although they are consistent with the hearing testimony and medical records which indicate a failed surgery with repeated injections . . . ."; and (iv) the ALJ "failed to state and consider the psychiatric disabilities as 'severe' impairments." (Doc. 18 at ID 1392-94, 1401). Each argument lacks merit.

The record shows, with clarity, that the ALJ considered Roy's medications: not only did the ALJ explicitly discuss Roy's responses to medication and treatment in her decision, (Tr. 22-23) ("[Roy's conditions] are helped by the injections and Neurontin.); (Tr. 20) ("The claimant's vaginal prolapse was treated surgically along with lysis of adhesions and related repairs in July 2012. . . . Subsequent notes reflect improvement after recovery and Marcaine injections." (internal citation omitted)), but she also spent considerable time at the hearing inquiring into Roy's various medical treatments, (Tr. 43-47); (Tr. 52-55); (Tr. 62-63). As such, the Court should pay Roy's argument on this count little mind.

Roy also cannot prevail in suggesting that the ALJ violated SSR 96-8p. To fulfill the provisions in SSR 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996), an ALJ "need only show how the evidence supported the RFC determination, discuss the individual's ability to perform work-related activities, and explain the resolution of any inconsistencies in the record." *Wolte-Rotondo v. Comm'r of Soc. Sec.*, No. 15-13093, 2016 WL 4087232, at *1 (E.D. Mich. Aug. 2, 2016); *see Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 548 (6th Cir. 2002) ("Although SSR 96-8p requires a 'function-by-function evaluation' to

determine a claimant's RFC, case law does not require the ALJ to discuss those capacities for which no limitation is alleged."). As noted earlier, "when a plaintiff previously has been adjudicated not disabled, she must show that her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity." *Casey*, 987 F.2d at 1232-33. The ALJ understood her task, and citing *Drummond*, performed the requisite analytical activity, explaining her conclusions in detail. *See generally* (Tr. 21-23).

Similarly, the ALJ's failure to expressly mention Roy's or her son's function reports does not betray justificatory poverty. "[T]he ALJ need not expressly mention every piece of evidence so long as the overall decision was supported by substantial evidence." *Noto v. Comm'r of Soc. Sec.*, 632 F. App'x 243, 250 (6th Cir. 2015). Because I conclude that substantial evidence supports the ALJ's decision, her failure to discuss these particular documents amounts to at most—in the most generous estimation for Roy—harmless error.

Roy's final, Step-Two argument also should fail. As an initial matter, Roy fails to articulate exactly what "psychiatric disabilities" the ALJ should have found to be severe or why. The Court should therefore consider the argument waived. *Accord United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010) ("Issues adverted to in a perfunctory matter, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."). But the claim also fails if considered on its merits. So long as the ALJ considers a claimant's "severe and nonsevere impairments in the

remaining steps of the sequential analysis[,] [t]he fact that some of [her] impairments were not deemed to be severe at step two is . . . legally irrelevant." *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008). The ALJ in this case considered both severe and nonsevere impairments in her ultimate analysis, and thus this Court cannot impute error to her decision to find certain impairments nonsevere at Step Two.

### H.   Conclusion

For the reasons stated above, the Court finds that the ALJ's decision is supported by substantial evidence.

## II.   ORDER

In light of the above findings, **IT IS ORDERED** that Roy's Motion for Summary Judgment, (Doc. 18), is **DENIED**, and the Commissioner's Motion for Summary Judgment, (Doc. 19), is **GRANTED**.

Date:  March 23, 2017                    S/ PATRICIA T. MORRIS
                                         Patricia T. Morris
                                         United States Magistrate Judge


### CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: March 23, 2017                     By s/Kristen Castaneda
                                         Case Manager